IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| MICHAEL M,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 5:21-cv-00040 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) |         United States Magistrate Judge |
|     Defendant.[2] | ) | |

Plaintiff Michael M. asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I recommend that the decision be reversed and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In late August 2019, Michael applied for SSI alleging that he was disabled by attention deficit hyperactivity disorder ("ADHD"), anxiety, major depression, autism spectrum disorder, back problems, breathing problems, and sleep apnea. *See* Administrative Record ("R.") 156–61, 189, ECF No. 14-1. He was twenty-seven years old, or a "younger person" under the regulations, at that time. R. 53; 20 C.F.R. § 416.963(c). Disability Determination Services ("DDS"), the state agency, denied his claim initially in February 2020, R. 53–68, and upon reconsideration that May, R. 70–83, 85. In November 2020, Michael appeared with counsel and testified at an administrative hearing before ALJ Tara J. Posner. R. 29–52. A vocational expert ("VE") also testified at this hearing. R. 49–51.

ALJ Posner issued an unfavorable decision on December 15, 2020. *See* R. 12–24. She found that Michael had "severe" impairments of morbid obesity, lumbar degenerative disc disease, asthma, depression, and anxiety, R. 14, but those impairments did not meet or medically equal a relevant Listing. R. 14–17 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 3.03, 12.04, 12.06). In her Listing analysis, ALJ Posner found that Michael's severe mental impairments caused "moderate" limitations overall in understanding, remembering, or applying information and in interacting with others and "mild" limitations overall in concentrating, persisting, or

maintaining pace and in adapting or managing himself. R. 15–16. ALJ Posner then evaluated Michael's residual functional capacity ("RFC") and found that he could perform "sedentary"[4] work, with the following additional restrictions:

> he can occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, and crouch, and never crawl. He can never be exposed to unprotected heights or moving mechanical parts, and can have occasional exposure to extreme heat and wetness. He can have frequent exposure to chemicals and irritants such as fumes, odors, dusts, gases, and poorly ventilated areas. He can perform simple, routine tasks. He can frequently interact with supervisors, co-workers, and the public.

R. 17. Michael had no past relevant work, R. 22, but based on the RFC finding and the VE's testimony, ALJ Posner found that he could perform the requirements of certain "sedentary" unskilled jobs in the national economy, *id.*, including order clerk, assembler, and document preparer, R. 23 (citing R. 50–51). Thus, she concluded that Michael was "not disabled" between August 2019 and December 2020. R. 24. The Appeals Council declined review, R. 1–6, and this appeal followed.

## III. Discussion

Michael challenges the ALJ's assessment of his mental RFC and her evaluation of the medical opinion evidence of record. *See generally* Pl.'s Br. 9–15, ECF No. 19. Specifically, he contends that the ALJ failed to properly analyze the opinion of consultative examiner Miles Diller, Ph.D. *See id.* He first argues that ALJ Posner failed to properly evaluate the supportability and consistency of Dr. Diller's opinion, as required by 20 C.F.R. § 416.920c(c). *Id.* at 12–14. Michael further contends that ALJ Posner erred by "cherry picking" certain findings by Dr. Diller while rejecting others. *Id.* at 14. His arguments are persuasive.

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 416.967(a). Sedentary work typically requires sitting for six hours during an eight-hour workday and occasionally standing and/or walking for the remaining two hours. *See Neal v. Astrue*, No. JKS 09-2216, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010).

A.    *Summary*

1.    *Relevant Medical Evidence*

In February 2017, Rachel Spurrier, Psy.D., performed a psychological evaluation of Michael "for diagnostic clarification and treatment recommendations." R. 267–73. Michael reported "having an individualized education plan ('IEP') throughout his early education and struggling with grasping material" and information both in classes at community college and in past employment. R. 267. Michael described current feelings of anger and loneliness, depressed mood, headaches, anxiety, nervousness, fatigue, difficulty concentrating, thoughts of self-harm, and trouble with impulse control. R. 268. During the evaluation, Michael's speech was fluent, clear, and coherent, but he was "talkative, tangential, and interruptive during conversation." *Id.* He demonstrated euthymic mood "during most testing with noted feelings of nervousness on working memory tasks[.]" *Id.* He showed a high level of interest and motivation to complete tasks, which he performed "at a moderate pace," and his thought processes appeared organized and logical. *Id.* Dr. Spurrier administered several tests, R. 268–71, and assessed, "[c]ognitively, [Michael's] performance fell in the overall Superior range with particular strength identified in perceptual reasoning and notable personal weakness with working memory skills," R. 271. Dr. Spurrier diagnosed ADHD and major depressive disorder, recurrent, moderate, and she opined that if Michael continued to engage in treatment, his prognosis was "excellent." *Id.* She recommended individual psychotherapy, a regular exercise routine, participation in social activities, consulting with a clinician, and possibly obtaining a complete medical evaluation. R. 272.

At a primary care appointment in November 2018, the nurse started Michael on Prozac after he reported depressed feelings, social anxiety, a lack of motivation, and trouble getting

along with his parents, with whom he lived. R. 285. In December, Michael reported improvement with Prozac, said he did not feel sad, and was noted to be "much happier." R. 283.

Throughout 2019 at appointments for various physical impairments, Michael often reported depression, R. 322, 348, 318, 313, 310, 304, 421, and in May he said his back injury exacerbated his depression, R. 313. In October, Michael reported a history of depression, R. 415, was diagnosed with depression, R. 416, and Florentina Dobrin, P.A., refilled his Fluoxetine and provided a referral for psychiatric talk therapy, *id.* Depression continued to be listed in Michael's active problems in April and June of 2020. R. 559, 572.

2.   *Medical Opinions*

Dr. Diller performed a consultative psychological examination of Michael in February 2020. *See* R. 390–94. Michael complained of depression and social difficulties, as well various physical impairments. R. 390. He said he experienced anxiety and suicidal thoughts with no plan, he felt intimidated when he went out in public, he had memory and processing issues, and he had problems retaining information. *Id.* Michael reported that he feared returning to work in part because he was worried that his forgetfulness would lead to mistakes, saying that his "[b]rain goes blank." R. 391. Mental status exam revealed full orientation, fair remote memory, good fund of knowledge, fair concentration/working memory, fair to good abstract reasoning, and good judgment and verbal reasoning. R. 392 ("The claimant's overall mental status is in the fair range."). Michael's speech rate, tone, and volume were good; his thoughts were expressed spontaneously with logic and relevance; his thought processes contained no looseness of associations, perseverations, fabrications, tangentiality, or circumstantiality; his thought content contained no preoccupations, paranoia, delusions, ideas of reference, or hallucinations; his affect was restricted; and his mood was sad. *Id.* Dr. Diller diagnosed major depressive disorder, mild to

moderate, recurrent; rule out post traumatic stress disorder; and rule out dissociative identity disorder. R. 393. He based these diagnoses on Michael's feeling sad, depressed, and lethargic, his tendencies to isolate himself and lose track of time, and his "appear[ing] to have another identity." *Id.* Dr. Diller's prognosis was fair to poor, as Michael was "not currently in treatment, isolated, with few skills and limited social support." *Id.*

Dr. Diller then assessed Michael's "adaptive and functional capacity for working full-time in a competitive setting" using a three-point "ability impairment" scale: "Mild = Almost no interference. Moderate = Some problems that might be successfully dealt with through modifications or accommodations. Marked = Problems that would preclude employment." R. 392. He opined that Michael had a "mildly impaired ability" to understand and remember instructions, locations, and work-like procedures, but that he could "do simple and repetitive tasks in a well-structured and well-monitored setting." *Id.* Michael had a "moderately impaired ability" to carry out instructions, to sustain a normal routine without special supervision, to maintain attention and concentration, to get along with coworkers, to respond appropriately to supervision, to maintain socially-appropriate behavior and adhere to the basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to deal with the usual stressors in competitive work, and to be aware of normal hazards and take appropriate action. R. 393–94. He had a "moderately to markedly impaired ability" to maintain regular attendance in the workplace and to complete a normal workday or workweek without interruptions from his psychiatric condition. R. 393. Dr. Diller opined that, overall, Michael had a "moderate to marked impairment level for functioning in full-time employment within a competitive setting . . . based on his depression, poor thinking ability, tendency to dissociate, feelings of anxiety, [and] poor social skills." R. 394. Dr. Diller explained that his opinion was

7

"based on an interview and available medical records," *id.*, including Dr. Spurrier's comprehensive mental evaluation from February 2017, *see* R. 390.

Psychologist Richard Milan Jr., Ph.D., reviewed Michael's records for DDS in late February 2020. *See* R. 58–64. He opined that Michael's "severe" ADHD and depressive disorder caused at most "mild" limitations overall in his ability to understand, remember, or apply information and "moderate" limitations overall in his abilities to interact with others, to concentrate, persist, or maintain pace, and to adapt or manage himself. *See* R. 58–59, 63. Micheal did not have any specific "understanding and memory limitations" that would affect his ability to work on a regular and continuing basis, R. 63, but he was "moderately limited" in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to work with or around others without being distracted by them, to complete a normal workday and workweek, to perform at a consistent pace without taking unreasonable breaks, to interact appropriately with the general public, to accept instructions from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting, R. 63–64. More specially, Dr. Milan opined that notwithstanding his severe ADHD and depressive disorder, Michael "would be able to perform familiar or routine tasks," "maintain concentration and attention for 2hr periods in order to complete an 8hr day," "interact appropriately w/ supervisors and coworkers in order to complete required duties," and "complete a normal workweek and perform at a generally consistent pace w/ others, w/ only minimal need for accommodations on an infrequent basis." R. 63. That said, Michael's "moderate limitations" in social interaction and adaptive functioning, R. 59, meant that he "would be able to interact w/ the public only for brief periods or infrequently," he would have "occasional difficulty responding appropriately to criticism from supervisors,"

8

and he "would need assistance adapting to change, unless infrequent or implemented gradually." R. 64. His "best performance would be realized in a well-spaced environment w/ only a few coworkers," *id.*, performing "familiar or routine tasks," R. 63. DDS reviewer William Carne, Ph.D., affirmed Dr. Milan's opinions in May 2020. R. 75–76, 79–81.

    3.    *Michael's Statements*

Michael submitted a Function Report to DDS in October 2019. *See* R. 207–14. He reported that he needed reminders to take care of his personal needs and grooming and to take his medicine, noting that his "depression has [him] actively forget." R. 209 (spelling corrected). He mostly talked to others on the computer and sometimes talked on the phone, but he never spent time with others in person. R. 211. Michael had problems getting along with family, friends, neighbors, or others, saying that they thought negatively of him, which caused fights. R. 213. He got along "comfortably" with authority figures, noting a "phobia of police due to hostile encounters." *Id.* Michael had trouble handling stress and changes in routine. *Id.* In a subsequent Function Report, Michael said that he no longer spoke with others on the phone or via the internet. R. 234; *see* R. 71 (Apr. 2020). He also found it difficult to concentrate, comprehend, and remember verbal instructions, although he followed written instructions "for the most part" if he remembered them. R. 234. Michael also had previously been laid off from his position at Walmart for problems with others, noting that he had "been mistreated before, and [he] used to stand up to [his] managers, when [he] cared." R. 235. He said he felt like he was under great pressure and was constantly fearful, and he had "[r]ecently [] broke down and questioned life." R. 236.

Michael testified at an administrative hearing before ALJ Posner in November 2020. *See* R. 29–52. He said his ADHD led him to speak before he thought, he could not retain new

9

information, he had difficulty recalling old information, and he could read the same thing several times and still not remember it. R. 42. Michael also had issues with concentration, stating that he would sometimes "trail off" and forget what words to say. *Id.* He said he had trouble holding a conversation, even with his closest friends. *Id.* He was "very antisocial," "afraid of saying the wrong things," and "intimidated" by people because of uncertainties over whether what he might say was appropriate. *Id.* He said that he had stopped socializing and going to meet people about one or two years ago and that since then he had "never really left [his] bedroom." R. 43. When asked the primary reason he was unable to return to work, Michael said his back injury limited him physically and that his mental impairments make it so he cannot remember his duties. R. 46–47 ("I can't remember how a work station needs to be. I can't remember how a cash register works."). He said that he had "failed at unloading and stocking" at a prior job with Wal-Mart, R. 47, because he "was extremely slow, or [] just couldn't remember things," R. 48.

B.   *Analysis*

Michael challenges the ALJ's RFC finding that he could perform simple, routine tasks, and "frequently"[5] interact with supervisors, coworkers, and the public, on a regular and continuing basis. *See* Pl.'s Br. 15 ("[I]f the ALJ had properly considered the opinion of Dr. Diller then a finding of disability would have been directed in light of the vocational expert's testimony." (citing R. 51, 394–95)). A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant

---

[5] "'Frequent' [or 'frequently'] means occurring from one-third to two-thirds of the time," or about six hours during an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983); *see also* R. 78. "Frequently" is less than "constantly," but more than "occasionally." *See* SSR 83-10, 1983 WL 31251, at *5 ("'Occasionally' means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday.").

evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

As part of determining a claimant's RFC, the ALJ must evaluate the medical opinion evidence of record. 20 C.F.R. § 416.920c(a). For claims filed after March 27, 2017, a "medical opinion" is a statement from a "medical source"[6] about what a claimant can do despite his or her impairments and whether one or more impairments causes limitations or restrictions in the ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. *Id.* § 416.913(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[.]" *Id.* § 416.920c(a). Instead, the ALJ "will articulate how [he or she] considered the medical opinions and prior administrative medical findings" in the claimant's record "according to paragraph (b)" of the governing regulation. *Id.* § 416.920c. Paragraph (b) in turn "promise[s] claimants that ALJs 'will articulate in their determination or decision how persuasive they find all of the medical opinions'" in the case record, *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *1 (E.D. Mich. Aug. 13, 2021) (quoting 20 C.F.R. § 416.920c(b)), and instructs that "[t]he factors of supportability and

---

[6] A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 416.902(d).

11

consistency are the most important factors [ALJs] consider when they determine how persuasive [they] find a medical source's medical opinion . . . to be," 20 C.F.R. § 416.920c(b)(2) (citations omitted). "Therefore, [ALJs] *will explain* how [they] considered the supportability *and* consistency factors for a medical source's medical opinions . . . in [the] determination or decision" on the disability claim. 20 C.F.R. § 416.920c(b)(2) (emphasis added); *see Hardy*, 2021 WL 3702170, at *3 (concluding that § 416.920c(b) creates "a procedural guarantee that an ALJ will explain—will 'articulate'—how persuasive [he or she] found each medical source . . . . but the regulations only require ALJs to discuss the . . . supportability and consistency" factors, and that "[f]or those two factors, the regulations further pledge that ALJs 'will explain how [they] considered the supportability and consistency factors for a medical source's opinions'" in the written decision) (quoting § 416.920c(b)); *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 416.920c "require our [ALJs] to consider all of the factors" in § 416.920c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness) ("*Revisions to Rules*"). Put differently, § 416.920c(b)–(c) states the "minimum level of articulation" ALJs must include in their written decisions "to provide sufficient rationale for a reviewing . . . court," *Revisions to Rules*, 82 F.R. 5844-01, "to determine whether the ALJ's decision is supported as a matter of fact *and* law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (emphasis added). *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. (internal citations omitted)); *cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d

12

656, 661 (4th Cir. 2017) (concluding that a regulation which "states the SSA *will* document application of the [special] technique in the decision" imposed mandatory duty of written explanation in evaluating mental impairments and explaining that an ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review").

"Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations *presented by a medical source* are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1) (emphasis added). "Consistency," on the other hand, means that "[t]he more consistent a medical opinion(s) . . . is with the *evidence from other* medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be." *Id.* § 416.920c(c)(2) (emphasis added). Thus, the ALJ must articulate how he or she considered each of those factors in determining persuasiveness for all medical opinions in the claimant's record. *See Revisions to Rules*, 82 FR 5844-01 ("This articulation *will include* the supportability *and* consistency factors, which generally includes an assessment of the supporting objective medical evidence and other medical evidence, *and* how consistent the medical opinion or prior administrative medical findings [are] with other evidence in the claim." (emphasis added)). ALJs "may, but are not required to, explain how [they] considered the factors" listed in § 416.920c(c)(3)–(5), such as the source's medical specialty or treatment relationship with the claimant. *Id.* § 416.920c(b)(2).

ALJ Posner's decision does not meet this "minimum level of articulation," *Revisions to Rules*, 82 FR 5844-01. ALJ Posner summarized Dr. Diller's findings. R. 21–22. Her entire analysis of Dr. Diller's opinion is as follows:

13

> This opinion is persuasive as to the moderate findings, but not the marked findings. There is no evidence in the file or given during the hearing supportive of any psychological marked findings. At most, the in-person consultative examination in combination with the testimony supports moderate findings in understanding, remembering, and applying information, and social interaction.

R. 22. ALJ Posner's evaluation of the supportability of Dr. Diller's opinion is deficient. Dr. Diller explained that his opinion was "based on an interview and the available medical records," R. 394, and he cited to the particular records he relied on in formulating his assessment, R. 390. Further, Dr. Diller detailed Michael's reported history of mental impairments, R. 390–91, and his findings on mental status exam, R. 391–92, and he found that Michael was a credible historian, R. 393. Thus, Dr. Diller discussed the medical evidence and Michael's report of symptoms, and he offered an explanation in support of his conclusions. The regulations instruct that in assessing the supportability of a medical opinion, the ALJ should evaluate the relevance of the "objective medical evidence and supporting explanations" provided by the medical source. 20 C.F.R. § 416.920c(c)(1). Yet, ALJ Posner offers no explanation as to how the medical evidence and explanation provided by Dr. Diller in support of his findings impacted the persuasiveness of his opinion. Instead, the ALJ merely concluded, without providing any explanation, that Dr. Diller's findings of "marked" limitations lacked support in the record and that only his findings of "moderate" limitations in understanding, remembering, and applying information, and social interactions were possibly supported. *See* R. 22. Such a perfunctory analysis fails to satisfy the regulation's "articulation requirement" and precludes meaningful review. *See Derek L. v. Kijikazi*, No. 3:20cv70, 2022 WL 636410, at *6–7 (W.D. Va. Mar. 3, 2022), *adopted by* 2022 WL 907196 (W.D. Va. Mar. 28, 2022).

ALJ Posner also failed to acknowledge the consistency factor in her decision, and she did not provide a logical analysis of that factor in evaluating Dr. Diller's medical opinion. *See*

14

*Dowling*, 986 F.3d at 386 ("Here, the ALJ neglected to even acknowledge the existence of these factors, much less engage in a meaningful discussion of them, so as to facilitate judicial review."). ALJ Posner stated that Dr. Diller's "marked" findings were at odds with the file and hearing testimony and that the consultative exam and the hearing testimony, at most, supported his findings of "moderate" limitations in understanding, remembering, and applying information and in social interactions. R. 22. The ALJ did not refer to any specific evidence that was inconsistent with Dr. Diller's opinion, nor did she explain why the evidence of record supported her conclusions. *See Roberta M. v. Saul*, No. 7:18cv243, 2019 WL 4786057, at *7 (W.D. Va. Sept. 30, 2019) ("In sum, the lack of reference to specific findings by Dr. Lemmer and to specific parts of the records that are inconsistent with his findings, frustrates meaningful review of the ALJ decision."). Moreover, she failed to recognize that Dr. Diller's definition of "marked" or "markedly" impaired, R. 392 ("Problems that would preclude employment."), was arguably more demanding than the regulatory definition of "marked" or "markedly" limited, R. 15 (noting that a "marked limitation is a seriously limited," but not absent, "ability to function on independently, appropriately, or effectively on a sustained basis"). The ALJ appears to have used the regulatory definition when evaluating Dr. Diller's opinion. *See* R. 15, 21–22. Thus, her statement falls short of the explanation required by 20 C.F.R. § 416.920c(c)(2). As such, the Court is left to guess as to how the ALJ reached her conclusions about the consistency of Dr. Diller's opinion. *See Mascio*, 780 F.3d at 637 ("Because we are left to guess about how the ALJ arrived at his conclusions. . . and indeed, remain uncertain as to what the ALJ intended, remand is necessary.").

Additionally, despite having found that Dr. Diller's opinion was "persuasive as to the moderate findings," R. 22, the ALJ did not accommodate many of those findings within her RFC

15

determination. For instance, Dr. Diller found that Michael was "moderately impaired" in his abilities to sustain a normal routine without supervision, to maintain attention and concentration, to respond appropriately to changes in the work setting, and to deal with the usual stressors encountered in competitive work. R. 393–94. The DDS psychologists identified many of the same "moderate" limitations and opined that Michael would "have occasional difficulty responding appropriately to criticism from supervisors," should be "in a well-spaced environment w[ith] only a few coworkers," could "interact w[ith] the public only for brief periods or infrequently," and "would need assistance adapting to change, unless infrequent or implemented gradually." R. 63–64, 80–81. The RFC finding, however, does not accommodate any of these specific limitations despite the ALJ's purported agreement with them. *See* R. 21–22. On the contrary, it allows Michael to interact with supervisors, coworkers, and the public for up to six hours during an eight-hour workday. *See* R. 17 ("He can frequently interact with supervisors, co-workers, and the public."); SSR 83-10, 1983 WL 31251, at *6. Further, Dr. Diller found that Michael was "moderately to markedly impaired" in his abilities to maintain regular attendance in the workplace and to complete a normal workday or workweek without interruptions from a psychiatric condition. R. 393. Although ALJ Posner disagreed with this finding to the extent that it found "marked" limitations, her conclusion suggests that she found it persuasive to the extent of the "moderate" limitations. *See* R. 22. Nevertheless, she did not include an accommodation for such "moderate" impairments in the RFC finding. If the ALJ agreed that Michael suffered from the "moderate" limitations Dr. Diller and the DDS psychologists attributed to his severe mental impairments, she should have accommodated those limitations within the RFC, or, alternatively, she should have explained why no such accommodations were necessary. The ALJ's failure to do either precludes meaningful review.

*See Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018) ("Absent more thorough and well-reasoned explanation, we cannot conduct meaningful judicial review of the ALJ's conclusions."). Accordingly, remand is warranted.

On remand, the ALJ should provide an analysis for how she evaluated the supportability and consistency of all medical opinions of record, identify specific evidence that supports her conclusion, and build an "accurate and logical bridge" from that evidence to her conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 29, 2022

*[signature: Joel C. Hoppe]*

Joel C. Hoppe
United States Magistrate Judge